**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**Asheile Diamonte Foster and Darren Jonathan Foster,**<br><br>**Defendants.** | **Case No. 26-MJ-62** |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF**
**PRETRIAL DETENTION FOR DEFENDANTS ASHEILE DIAMONTE FOSTER AND**
**DARREN JONATHAN FOSTER**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its motion that Defendants Asheile Foster and Darren Foster be detained pending trial pursuant to 18 U.S.C. § 3142(f)(1)(A) (Crime of Violence) 18 U.S.C. § 3142(f)(1)(E) (Firearm/Other Dangerous Weapon) of the Bail Reform Act.  In addition, the charged offenses trigger a rebuttable presumption of detention under 18 USC § 3142(e)(3), as they involve the use of firearms in connection with violent criminal conduct. That presumption squarely applies here and is not rebutted- indeed, it is reinforced by the defendants' actions. Accordingly, it is presumed that no condition or combination of conditions will reasonably assure the safety of the community or the defendants' appearance as required.

The facts of this case confirm that detention is not just warranted, but necessary. On March 23, 2026, the defendants planned, plotted and coordinated to ambush and unload an AR-15 rifle and a 9 mm pistol towards defenseless Sergeant Ryan McDermott as he drove away trying desperately to escape.  The use of an AR-15- a high-velocity, military style weapon designed to

1

inflict catastrophic damage- combined with coordinated gunfire, underscores the extreme danger the defendants pose to law enforcement and the public alike.

In addition, as to defendant Asheile Foster, temporary detention is independently warranted under 18 U.S.C. §3142 (d) because he committed this offense while on pre-trial release in another case. Considering the factors specified under 18 U.S.C. § 3142(g), there is no condition or combination of conditions that will reasonably assure their appearance in court and the safety of any other person and the community.

## BACKGROUND

On March 23, 2026, Seargeant Ryan McDermott was conducting surveillance related to a March 20th, 2026, shooting at an Eid Celebration in the District of Columbia. Video surveillance identified defendant Asheile Foster as a person of interest, capturing him appearing to have a firearm at the scene of the shooting. The day before, on March 22, 2026, members of the United States Park Police, including Sergeant McDermott, had arrested Foster for trafficking fentanyl and other controlled substances. Undeterred by that arrest and continuing to pose a grave and serious danger to the community, Sergeant McDermott tracked Foster from the US Park Police Anacostia Operations Facility to 5046 Queens Stroll Place SE Washington D.C- his residence- confirming his connection to the location that would shortly become the site of a violent ambush.

At approximately 7:30, defendant Asheile Foster, together with his brother, defendant Darren Foster, unleashed a barrage of approximately 32 rounds at the intersection of Queens Stroll Place SE and 51st Street SE, Washington, D.C, targeting Sergeant McDermott as he attempted to flee and save his life.  One of those rounds pierced Sergeant McDermott in the left shoulder- entering and exiting his left shoulder. Despite being shot, Sergeant McDermott

radioed, "Shots fired" and "I'm hit but I am good" as he drove himself to safety near Benning Road and Hillside Road SE, bleeding, injured and in significant pain from his gunshot wound.

The defendants' gunfire riddled the vehicle, striking multiple points, including the rear bumper and trunk, the rear driver's side door and window, and the driver's door itself. The sheer volume and dispersion of the gunfire underscore the calculated and sustained nature of the attack-and the extraordinary fact that Sergeant McDermott survived. This was not reckless gunfire. The defendants were shooting to kill.

The crime scene silently spoke to the extreme violence associated with this ambush by gunfire. Numerous shell casings were in the street near 5046 Queens Stroll Place. Twenty-three .300 Blackout shell casings and nine 9mm casings were recovered in this residential street in the sixth district which was less than 1000 feet away from the C.W. Harris Elementary School-placing the surrounding community directly in harm's way.

Responding officers located a black backpack wedged between the rear fence of 5046 Queens Stroll Place SE and a fence leading to the rear alley. Inside was a stolen AR-15 rifle-style firearm- undoubtedly one of the weapons used to assault Sergeant McDermott.  At 7:51 pm, law enforcement cleared 5046 Queens Stroll Place SE and continued to hold the location in anticipation of a search warrant.

Surveillance footage from an MPD crime camera located at 51st and Queens Stroll Place SE told the complete story of what happened.  Prior to the ambush, an individual wearing a black jacket or sweatshirt with a white striped down both sleeves and black pants with a white stripe down both pant legs, later identified as defendant Darren Foster (DOB: 2/25/2005, PDID: DC779316), was standing in front of 5046 Queens Stroll Place SE.

3



*Figure 1: Still image from surveillance video of the individual wearing a black jacket or sweatshirt with a white stripe down both sleeves and black pants with a white stripe down both pant legs (subsequently identified as Darren FOSTER) standing in front of 5046 Queens Stroll Place SE.*

A few seconds later, a second individual emerges from the area of the front door of 5046 Queens Stroll Place SE wearing what appears to be a reddish/brownish in color jacket or sweatshirt and reddish/brownish pants- further confirming coordinated activity at the scene.

Surveillance footage then captures defendant Asheile Foster (DOB: 4/19/2003, PDID: 745274) arriving on scene in the dark colored Ford Fusion and park in front of 5046 Queens Stroll Place SE. Witness 1- a relative of both defendants- emerged from the driver's side of the vehicle. Witness 1 got out of the car and began to cross the street walking in the direction of 5046 Queens Stroll Place SE.

As Witness 1 stood on the sidewalk in front of 5046 Queens Stroll Place SE, defendant Darren Foster moved deliberately into the middle of the street positioning himself as events rapidly unfolded. At that same moment, Sergeant McDermott drove his white Tesla past defendant Darren Foster. As the vehicle passed, defendant Darren Foster immediately opened fire, extending his arms and aiming directly at the fleeing vehicle. Surveillance footage captures a visible muzzle flash emanating from the firearm as he discharged multiple rounds in the direction of Sergeant McDermott. This was not spontaneous or reckless conduct. Defendant Darren Foster had already taken position in the roadway, waited for the vehicle to approach, and then fired as it passed- demonstrating calculated, targeted action consistent with an ambush.



*Figure 3: Still image of surveillance video of subject in the black jacket with stripes (subsequently identified as Darren Foster) in a shooting stance firing what appears to be a firearm.*

As this was happening, simultaneously, defendant Asheile Foster, wearing a white or light-colored hoodie, emerged from the dark colored vehicle and walked directly into the path of Sergeant McDermott's approaching Tesla. Sergeant McDermott was forced to swerve to avoid striking him as Asheile Foster aggressively advanced toward the vehicle and attempted to kick it- further escalating this already dangerous encounter.

Immediately after the white Tesla passes, defendants Darren and Asheile Foster crossed the street together. With the white Tesla leaving the camera frame, the subject wearing the reddish/brownish clothing produced a rifle-style firearm (presumably the AR-15 recovered on scene) and handed it over to defendant Asheile Foster.





*Figure 5: Subject in white hoodie (subsequently identified as Asheile FOSTER) taking possession of rifle-style firearm from subject in the reddish/brownish clothing.*



*Figure 6: Subject in white hoodie (subsequently identified as Asheile FOSTER) in possession of rifle-style firearm.*

Armed with the rifle, defendant Asheile Foster opened fire, discharging multiple rounds at Sergeant McDermott as he drove away trying to escape the onslaught.  Surveillance footage captures muzzle flash and small puffs of smoke emanating from the firearm as he continued firing the direction of the fleeing vehicle.  It was from this location that numerous expended shell casings were later recovered, including .300 blackout casings which are typically fired from rifle-style firearms further confirming both the weapon used and the intensity of the attack.



*Figure 7: Subject in white hoodie (subsequently identified as Asheile FOSTER) in shooting stance holding what appears to be a rifle-style weapon.*

After opening fire, all three individuals walked towards the front door of 5046 Queens Stroll Place SE, disappearing into their house that day.  The rapid return to the home following a coordinated shooting further underscores the defendants' joint participation and consciousness of guilt.

The events that brought Sergeant McDermott to that block- and into the defendant's line of fire- only heighten the seriousness of this offense. Just one day earlier, on March 22, 2026, Sergeant McDermott's unit had arrested Asheile Foster (CCN # 26037570) for drug dealing-specifically fentanyl and other controlled substances. Yet within hours of his release, defendant

Asheile Foster armed himself with a rifle-style firearm, and participated in a brazen, targeted shooting.

On March 23, 2026, defendant Asheile Foster appeared at the Anacostia Park Police Station to recover some of his personal property which was seized during his arrest. At the same time, Sergeant McDermott was actively investigating the March 20th shooting and seeking to identify Foster's residence to secure a search warrant for the firearm he believed defendant Asheile Foster possessed. Sergeant McDermott wanted to identify an address so that a search warrant for his residence could be submitted to a Judge. Instead, he was met with a coordinated ambush.

Sergeant McDermott and other members of USPP followed defendant Asheile Foster who was the passenger in the black Ford Fusion driven by W-1. The vehicle contained only two individuals- Foster and the driver. As Sergeant McDermott traveled along Queens Stroll Place SE somewhere between 51 Street SE & 53rd Street SE the Ford Fusion came to a stop on the side of the road.

Defendant Asheile Foster ran out into the road in front of the Complainant's vehicle and began banging on the hood of the white Tesla to block his path and prevent him from leaving. He wasn't scared or attempting to disengage- he was attempting to stop the officer from escaping.

Sergeant McDermott swerved around defendant Asheile Foster and attempted to flee, his instinct, telling him something was about to happen. His instincts proved correct gunfire erupted. A barrage of shots rang out, and Sergeant McDermott was struck. Based on his training and experience, the rapid, sustained gunfire seemed consistent to him with a firearm equipped with an automatic conversion device. As he fled the scene under fire, ambushed from behind, Sergeant McDonald was unable to see who was shooting at him.

9

Following the shooting, USPP Investigator Rice ordered the occupants out of the residence.  Witness 1 was detained, along with defendant Darren Foster, who was now wearing different clothing- further evidence of consciousness of guilt. Witness 1 told police they were asked by defendant Asheile Foster for a ride from his residence at 5046 Queens Stroll Place SE to the USPP to pick up his personal property.  Once the property was obtained, they drove back to 5046 Queens Stroll Place SE.  Witness 1 stated that they observed the Tesla following them and observed some police vehicles on Benning Road and wanted to stop, but defendant Asheile Foster stated "No [relationship redacted] don't stop."

When Witness 1 arrived at the location, Witness 1 stated that they parked the vehicle and defendant Asheile Foster exited the vehicle to confront the driver as to why they were following them.  Witness 1 stated that as Witness 1 was walking towards the front of 5046 Queens Stroll Place SE, Witness 1 heard a large number of gun shots.  Witness 1 dropped to the ground until the shooting stopped.   After the shooting stopped, Witness 1 ran into the house.

On March 24, 2026, law enforcement officers interviewed Darren Foster. At the time of the shooting, defendant Darren Foster was inside 5046 Queens Stroll Place SE when he received a call stating that his family was being followed and was told to come outside. He claimed that when he stepped into the roadway, he was unable to see who was driving due to heavily tinted windows.

Defendant Darren Foster initially gave law enforcement a self-serving statement that when he got close, the people in the white Tesla started shooting and that he heard four to five shots.  He wasn't sure how many shots he heard, but he estimated it to be 4-5 shots. Defendant Darren Foster was asked how Tesla actually shot (i.e. did one of the windows come down, etc.) and he couldn't provide an explanation.

That account is flatly contradicted by the evidence. There is no evidence that any law enforcement officer discharged a firearm. After Seargeant McDermott was discharged from the hospital, a round count was of his duty weapon confirmed that no rounds were missing- the firearm remained fully loaded. Indeed, due to the nature of the ambush, Sergeant McDermott had little time to do anything other than flee to save his life.

When confronted with the MPD crime camera footage, Defendant Darren Foster identified himself in the surveillance footage. But when further confronted with the same footage showing that individual he identified as himself firing a gun in the direction of the white Tesla, he once again gave a self-serving statement, changing his earlier statement- now claiming that the individual depicted was not him.

On March 24, 2026, Detective McCarthy obtained a residential search warrant from the Superior Court of the District of Columbia for 5046 Queens Stroll Place SE. On the same date, at approximately 1:58 p.m., members of MPD, ATF, and USPP executed the search As mentioned above, the aforementioned backpack in the rear of the residence revealed a Diamondback DB-15 (marked "Cal. Multi") AR-15-style rifle with no stock. The DB-15 had 15 rounds of .300 blackout caliber ammunition in the magazine and one round in the chamber. The ammunition seemingly matched the casings found at the scene of the shooting. The firearm had a capacity to hold 60 rounds.

A search of the attic revealed a Glock 19, 9mm pistol with a magazine which extended beyond the bottom of the magazine well. The Glock 19 was loaded with 17 rounds of 9mm ammunition in the magazine and one round in the chamber. The ammunition seemingly matched the casings found at the scene of the shooting. The firearm had a capacity to hold 31 rounds

In addition to other items of evidence, law enforcement also recovered an AR-15 style apparent 3d printed lower receiver from the first-floor bedroom and multiple firearms magazines, additional ammunition of multiple calibers (including 9mm and .300 blackout), as well as clothing which appeared to match the clothing worn by defendant Darren Foster during the shooting. A hooded sweatshirt like the one which appears to have been worn by defendant Asheile Foster, both while collecting his property from USPP as well as during the shooting, was recovered. Within that sweatshirt, an arrest bracelet with defendant Asheile Foster's name and associated identifiers on it was recovered.



*Figure 12: Hooded sweatshirt recovered by law enforcement similar to the one which appears to have been worn by defendant Asheile Foster while collecting his property from USPP.*



*Figure 13: Diamondback DB-15 (marked "Cal. Multi") AR-15-style rifle recovered from backpack at rear of residence.*



*Figure 14: Glock 19, 9mm pistol with a magazine recovered from attic of residence.*

**ARGUMENT**

13

Under the Bail Reform Act, if the Court determines that "no condition or combination of conditions will reasonably assure the appearance of [a defendant] as required and the safety of any other person and the community," the Court shall order a defendant held pending trial. 18 U.S.C. § 3142(e). When determining whether any condition or combinations of conditions will assure the safety of the community, in light of any applicable presumptions, the Court weighs four factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by release. *See* 18 U.S.C. § 3142(g).

In making the pretrial detention determination, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). Specifically, the presentation of hearsay evidence is permitted, and the government may proceed by proffer. *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986); *see also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992). A pretrial detention hearing should not be used as a discovery device. *See Smith*, 79 F.3d at 1210 and *Williams*, 798 F. Supp. at 36.

The Government seeks detention pursuant to 18 U.S.C. § 3142(f)(1)(E) (felony involving possession of a firearm). The facts and circumstances in this case demonstrate that there are no conditions or combination of conditions that would assure the safety of the community or Defendant's return to Court should he be released. *See* 18 U.S.C. § 3142(e)(1). All four § 3142(g) factors favor detention pending trial, including: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics;

14

and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release.

Additionally, in this case the defendant is subject to the rebuttable presumption of detention under 18 USC. § 3142(e)(3) as there is probable cause to believe he committed a qualifying crime of violence. The grand jury's return of an indictment alone establishes probable cause and triggers the presumption. Once triggered, the presumption reflects Congress's determination that defendants charged with serious violent offenses pose a heightened ris of both danger to the community and nonappearance. It does not disappear when rebutted, it remains a factor to be weighted among the § 3142(g) factors.

## I.       The Nature and Circumstances of this Offense Merits Detention.

The nature and circumstances of this offense weigh overwhelmingly in favor of pretrial detention. This case involves a violation of 18 USC §111(b) and 924(c)- a crime of violence in which the defendants shot a law enforcement officer. Assaulting a federal officer is serious; shooting one elevates the conduct to its most dangerous form. The defendant did not merely resist or evade- he used a firearm to inflict potentially lethal force on an officer performing official duties.

The danger posed by this conduct cannot be overstated. Firing a weapon at a law enforcement officer reflects a complete disregard for human life and the rule of law. As courts have recognized, even the "best case" scenario in such violent encounters place victims at extreme risk of death or serious bodily injury. Here, the defendants escalated the encounter to gun violence, creating the exactly the kind of grave and ongoing danger that the Bail Reform Act is designed to prevent. The defendants were not scared- they did not flee, de-escalate or attempt to avoid confrontation. Instead they aggressively advanced, positioned themselves, and opened fire. The

volume of gunfire- over 30 rounds- confirms what the evidence already makes clear: they shot to kill.

The defendants' claim that they did not know Sergeant McDermott was a law enforcement officer is a distinction without a difference. The law does not recognize such a distinction, and the facts render it irrelevant. On the face of their conduct alone, this crime presents an extraordinary danger to the community.

First, one of the guns used in this case was a stolen AR-15. Unlike a typical handgun, an AR-15 is a high-velocity semi-automatic weapon designed to fire rounds at speeds that cause catastrophic injury. The rounds fired from such a weapon are designed to fire rounds at speeds that cause catastrophic injury. The rounds fired from such a weapon travel at such a velocity that they can fragment and cavitate upon impact, dramatically increasing the likelihood of severe trauma or death. This is not a weapon of impulse or proximity- it is a weapon capable of inflicting mass casualties in seconds. When defendant Ashelei Foster chose to fire the AR-15 in the manner that he did, he displayed the specific intent to kill.

Second, the evidence shows that Defendant Darren Foster fired first. As Sergeant McDermott drove away trying to flee the scene, , in a planned, coordinated attack, defendant Darren Foster fired first.

Third, this deluge of gunfire was planned, coordinated and executed on a residential street, right out in the community, less than 1000 feet from the school- placing the surrounding community at immediate and unacceptable risk. This alone shows what danger defendants pose to the community.

Finally, Defendants had an arsenal of illegal weapons in their home. This alone, when couples with their actions on the date of the offense, show what a danger they each possess to the

16

community. These defendants are not only willing but prepared to engage in extreme violence.

The nature and circumstances of this offense weigh heavily in favor of pre-trial detention. This case involves the defendants shooting at a law enforcement officer- conduct that represents one of the most serious forms of violence. One defendant first discharged a 9mm pistol, and the second subsequently escalated the encounter by firing an AR-15 style rifle at the officer. This was not mere possession or brandishing- this was a coordinated, escalating gunfire directed at law enforcement.

This was not a momentary lapse- it was deliberate, escalating violence that reflects a complete disregard for human life and confirms that no condition or combination of conditions can reasonably assure the safety of the community.

## II.      **The Weight of the Evidence Against the Defendants Favors Detention.**

The second factor to be considered—the weight of the evidence—overwhelmingly favors detention.  The Government's case is not circumstantial or speculative; it is direct, corroborated and compelling.[1]  The entire shooting is captures on surveillance footage, documenting the defendant's coordinated actions before, during, and after the attack. The videoevidence alone is powerful.  But it is not standing alone.

The defendants are identified through multiple independent sources, including video

---

[1] Here, the weight of the evidence should be considered equally with the other § 3142 factors.  In *United States v. Blackson*, following a thorough review of the text of § 3142 and decisions analyzing this factor, Judge Howell found that "the weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors." 2023 U.S. Dist. LEXIS 18988, at *29-30.  Instead, "the weight of the evidence against [a] defendant [should] be weighed as all factors are—in accordance with the specific facts of this case—to determine whether pretrial detention is appropriate." *Id.*  In an unpublished opinion, the D.C. Circuit affirmed Judge Howell's decision. *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023).  Moreover, the Second Circuit reached the same decision after a thorough and careful analysis of the issue. *United States v. Zhe Zhang*, 55 F.4th 141, 149-150 (2d Cir. 2022). This Court should follow *Blackson* and *Zhang;* this factor should be given no less weight.

surveillance, witness statements, and physical evidence recovered at scene. Firearms consistent with those used in the shooting- including a rifle-style weapon- were recovered along with numerous shell casings that match the weapons depicted in the footage. The defendants' clothing observed in the video is consistent with what was recovered, further linking them to the offense.

The sequence of events captured on video leaves no ambiguity. The defendants positioned themselves in advance, confronted the victim's vehicle, and opened fire as Sergeant McDermott attempted to flee. One defendant fired first with a handgun; the second escalated the attack by deploying a rifle and continuing to fire. This was a coordinated ambush, not a spontaneous encounter. The volume of gunfire- over 30 rounds- confirms sustained, intentional use of lethal force.

Equally significant are the defendants' own statements. Defendant Darren Foster provided shifting, internally inconsistent accounts when interviewed by law enforcement. He initially claimed that the occupants of the Tesla fired first- a claim that directly contradicted by both video evidence and physical evidence showing that Sergeant McDermott's firearm was never discharged. When confronted with video surveillance showing him in the roadway, Darren Foster admitted his presence in the roadway. But when confronted with footage showing the shooter firing at the vehicle, Defendant Darren Foster changed his account again and denied being the individual being depicted. These evolving statements are not credible- they are a clear attempt to minimize culpability in the face of overwhelming evidence.

The strength of the government's case is underscored by consistency across all forms of evidence: video, physical recovery, and direct observations all tell the same story. There are no meaningful gaps in evidence or contradictions. Instead the evidence is mutually reinforcing and points unequivocally to the defendant's guilt. "[I]f the evidence against a defendant is

overwhelming, credible, helpful, and important to the government's case in chief, that may increase the risk that defendant will flee to avoid future court proceedings and may indicate that the defendant is a present danger to himself or the community if the government's allegations later prove to be true." *Blackson*, 2023 U.S. Dist. LEXIS 18988, at *29-30.  So it is in this case: the weight and strength of the evidence increases the prospect that Defendant will present a danger to the community if released.

III.    **Defendants' History and Characteristics Also Favor Detention.**

The third factor, the history and characteristics of the defendant—also favors detention. Based on the Pretrial Services Report, Defendant Asheile Foster has two prior adult convictions and six prior arrests. What is perhaps even more troubling, is that at the time that he was shooting an AR-15 into the streets of Washington D.C., the defendant was on release for Distribution of a Controlled Substance. Undeterred by his arrest, the defendant was released by the Court on March 23, 2026, and it was shortly thereafter that he was shooting at Sergeant McDermott in the instant offense.

The defendant is no stranger to possessing illegal firearms.  On May 10, 2023, the defendant was arrested for Carrying a Pistol Without a License and related charges.  On September 27, 2024, he was plead guilty to Attempted CPWL and Attempted Unlawful Possession of Ammunition.

On March 22, 2026, USPP Investigators observed the defendant dealing drugs. Recovered from his groin area was suspected fentanyl and alprazolam.  Notably, when arrested in the instant case, the defendant tested positive for fentanyl on March 25, 2026. It was under these circumstances, and immediately upon release from custody that the defendant armed himself with an AR-15 and fired shot after shot at Sergeant McDermott on the residential streets of Washington

19

D.C.

Defendant Asheile Foster's history and characteristics strongly support detention. Most notably he committed the instant offense while on pretrial release in another case. This status is critical. It means the defendant was already subject to court-imposed conditions specifically designed to deter criminal conduct and protect the public. Despite those restrictions- and with full awareness he was under active judicial supervision- the defendant chose to engage in new, violent criminal conduct.

This is not a case where conditions have yet to be tested. They have been tested- and they failed. The defendant's decision to reoffend while on release demonstrates a clear disregard for the law and for the authority of the Court. It also establishes that he is unwilling or unable to comply with any set of conditions. If the defendant could not abide by conditions already imposed, there is no reason to believe that additional or stricter conditions would succeed where prior ones did not. Accordingly, defendant Asheile Foster's history and characteristics weigh heavily in favor of detention because they show no condition or combination of conditions can reasonably assure the safety of the community.

Although Defendant Darren Foster may point to a lack of prior criminal history, that fact does not mitigate the danger he poses- in fact, it underscores it. The defendant has now demonstrated a willingness to engage in extreme, unprovoked violence by firing a 9mm pistol at a law enforcement officer. This was not impulsive, low-level misconduct; it was a deliberate decision to use lethal force.

Courts have recognized that a defendant's lack of prior record does not outweigh clear evidence of present dangerousness, particularly where the charged conduct itself is extraordinarily violent. Here, the defendant's history is less probative than his conduct in this case- which reveals

20

a capacity for violence that cannot be ignored.

Nor do any asserted ties to the community, employment or lack of prior convictions meaningfully reduce that risk. Those same factors existed at the time of the offense and did nothing to deter the defendant from engaging in life threatening conduct. The Court should not credit a previously clean record over the defendant's demonstrated willingness to engage in reckless, criminal conduct that significantly endangers the community.

In short, both defendants history and characteristics do not weigh in favor of release- they confirm instead that instead of walking away they chose to escalate to gun violence. This choice establishes a level of dangerousness that no condition or combination of conditions can reasonably mitigate.

## IV.    The Defendants Present a Danger to Our Community.

The fourth and final factor—danger to any person or the community posed by Defendant's release—similarly weighs in favor of detention.  The D.C. Circuit has noted that "[w]hen the Government proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community," pretrial detention is available to "disable the arrestee from executing that threat." *United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021) (quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987)).  This factor requires the Court to make a "forward looking determination" about the defendant's risk of danger to the community, keeping in mind that detention may be justified even if the Court does not explicitly find that the defendant is a risk of committing acts of violence.  *United States v. Hale-Cusanelli*, 3 F.4th 449, 456 (D.C. Cir. 2021) (citing *Munchel*, 991 F.3d at 1283).

The defendants present an acute and ongoing danger to the community that no condition or combination of conditions can mitigate. This case is not about isolated or impulsive conduct- it

21

is about co-ordinated, escalating violence, carried out with firearms in a residential neighborhood. Together, the defendants positioned themselves, confronted a vehicle, and unleashed a sustained barrage of gunfire, including the use of a rifle-style weapon capable of inflicting catastrophic harm. This was a deliberate ambush, executed in concert, and directed at a fleeing victim.

Both defendants have shown a willingness not just to possess a firearm, but to use them- repeatedly and in a sustained manner- to endanger life. They did not retreat, de-escalate or disengage. They instead continued, moved forward and continued firing as Sergeant McDermott attempted to escape. This was not defensive conduct. It was not reactive. The defendants were not scared. They had multiple safe, lawful alternatives; they could have alerted law enforcement, walked away, or simply gone inside the residence. Instead, they chose to confront and to shoot- demonstrating aggressive purposeful violence and a complete disregard for the safety of human life.

The danger extends beyond the immediate victim. The defendants discharged more than 30 rounds on a residential street, less than 1,000 feet from a school, placing bystanders at risk of death or serious bodily injury. The introduction of a rifle into the encounter- after the initial shots were fired- demonstrates not only coordination but a willingness to escalate violence mid-incident to increase lethality. That capacity for violence makes them uniquely dangerous.

Further, the defendants conduct both before and after the shooting confirms that the danger is ongoing. They armed themselves from their arsenal of weapons that were stored in their own residence, coordinated their actions, and then retreated together to a shared location. One defendant changed clothing. Defendant Darren Foster offered shifting and self-serving statements when confronted by law enforcement. This is not the behavior of individuals who can be trusted to comply with court-ordered conditions- it is the behavior of people who are willing to evade

accountability.

Finally, the speed with which this violence followed other criminal conduct underscores the immediacy of the threat. One defendant had just been arrested for trafficking fentanyl and within hours of release, rearmed himself and participated in a targeted shooting. That sequence makes clear that prior law enforcement intervention did nothing to deter further violence.

In sum, the defendants demonstrated a willingness to engage in coordinated armed violence, the capacity to escalate that violence using high-powered firearms, and a complete disregard for lawful alternatives to avoid harm. On this record, there is no condition or combination or combination of conditions that can reasonably assure the safety of the community.

### V.    Defendants Cannot Rebut the Presumption.

Defendant Asheile Foster cannot meaningfully rebut the presumption under 18 U.S.C. § 3142(e). Any argument that conditions of release could reasonably assure community safety is squarely undermined by the defendant committing the instant offense while already on pre-trial release in another case- under conditions specifically designed to prevent further criminal activity. That fact alone demonstrates that supervision has already failed.

Defendant Darren Foster cannot overcome the presumption with generalized assertions of community ties, employment or lack of prior convictions. Courts have continuously held that such routine factors are insufficient to rebut the presumption in serious violent cases. Even if the defendant produces some evidence, the presumption remains in the case- and here the § 3142 (g) factors overwhelmingly confirm detention is warranted.

**CONCLUSION**

The Government respectfully requests that the Court issue an Order granting its motion

that Defendant be held without bond pending trial.


Respectfully submitted,

Jeanine Ferris Pirro
United States Attorney

By:   /s/ Gauri Gopal
      Gauri Gopal
      PA Bar No. 306718
      Assistant United States Attorney
      Federal Major Crimes Section
      United States Attorney's Office for D.C.
      601 D Street NW, Fifth Floor
      Washington, D.C. 20530